J-A29039-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: L.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: L.W., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 771 WDA 2021 |

Appeal from the Order Entered June 4, 2021
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000099-2019

BEFORE: BENDER, P.J.E., DUBOW, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:        **FILED: NOVEMBER 22, 2021**

L.W. (Father) appeals from the order entered in the Court of Common Pleas of Allegheny County (orphans' court) involuntary terminating his parental rights to L.W. (d.o.b. September 2011) (Child) and changing her permanency goal to adoption. He challenges the court's finding that termination would best serve the developmental, physical and emotional needs of Child pursuant to 23 Pa.C.S. § 2511(b).[1] We affirm.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] Mother has appealed the June 4, 2021 termination of her parental rights to L.W. and her two siblings at docket numbers 770 WDA 2021, 772 WDA 2021 and 774 WDA 2021. She is not the subject of this appeal.

We take the following factual background and procedural history from our independent review of the certified record and the trial court's August 11, 2021 opinion.[2]

## I.

Allegheny County Office of Children, Youth & Families (CYF) became involved with the family in 2012 and continued to receive General Protective Services (GPS) referrals raising multiple child welfare issues. On March 14, 2018, maternal grandmother filed a private dependency petition for Child and her sister. On April 23, 2018, after Child's mother was incarcerated for violating the terms of her probation, CYF filed a dependency petition for Child. Father was also incarcerated at the time, making him unable to care for Child.

On April 25, 2018, the court placed Child in kinship care with maternal grandmother, where she has remained since then. On May 23, 2018, Child was adjudicated dependent.[3] At the time of adjudication, the court found that

---

[2] Father's "Case History" section is nearly a verbatim copy of the "Background" set forth in the orphans' court's August 11, 2021 opinion, simply with the footnotes removed and an amendment that the evidence did **not** establish that terminating Father's parental rights served Child's needs and welfare. (**See** Father's Brief, at 6-10); (Orphans' Court Opinion, 8/11/21, at 2-7). We merely note this because it is curious since the recitation contains language that is completely antithetical to Father's interests and supports the orphans' court's decision.

[3] The dependency petition also included Child's two siblings. The court adjudicated all three children dependent, and they have remained in maternal grandmother's care with Child.

Father had never had Child continuously in his care and that, to achieve reunification, Father needed to maintain a relationship with Child and demonstrate appropriate parenting skills. His specific reunification goals were to resolve his criminal issues, attend a drug and alcohol assessment and follow any resulting recommendations, submit to urine screens, document services and participate in case planning activities and attend visits with Child. While both incarcerated and in the community, CYF provided and/or Father had access to these services.

On July 2, 2020, CYF filed the subject petition for the involuntary termination of parental rights.[4] At the hearings on the petition, CYF presented the testimony of CYF Caseworker Lisa Ketter, court-appointed expert evaluator Dr. Patricia Pepe, Allegheny County lab technician Daniel Zoldos, Parole Officer Ryan Niznik and maternal grandmother. Father testified on his own behalf.

At the time of the hearings in this matter, Father was detained at Allegheny County Jail (ACJ) on three sets of criminal charges in other counties and two technical violations of probation in Allegheny County, including one for possession of narcotics. Father had been incarcerated off and on for a

---

[4] On May 28, 2019, CYF filed a first petition to voluntarily terminate Father's parental rights that was denied by the court on October 1, 2019. The court found that although there were grounds to terminate, the evidence did not establish that termination would serve Child's needs and welfare.

total of approximately six years since 2013, when Child was approximately one-and-a-half-years-old, until the time of the hearing, when Child was approximately nine-and-a-half years old. Father was released from ACJ in March 2020 because of an attempt to decrease the jail population during the Covid-19 pandemic, but new charges were filed against him and he was again detained in August 2020.

Testimony established that Father failed to meet his court-ordered goals. He did not document his work with services while incarcerated or either his participation or completion of drug and alcohol treatment while out of jail. He completed only one out of 15 urine screens and admitted his positive screen for THC and opiates. He neither maintained contact with CYF nor participated in case planning activities. He continued to engage in criminal behavior and supervision while on probation was unsatisfactory.

CYF had parenting concerns about Father because of his criminal history, substance abuse and because he had never had continuous care of Child and little contact with her. Maternal grandmother also had concerns about his demeanor and inappropriate statements during the limited contact he had with her, Child and her siblings.

Although Father was initially permitted supervised visits with Child at maternal grandmother's home, the court moved them to CYF in September 2018 and again on July 27, 2020, because of maternal grandmother's safety concerns. Father had no visits at CYF before he was incarcerated in December

2018 or while he was out of jail between March and August 2020. During his incarceration between December 2018 and March 2020, he had several visits with Child in ACJ but Child "experienced a great deal of trauma based on those visits," becoming "extremely upset, screaming, yelling and climbing the walls." (N.T. Hearing, 5/21/21, at 25-26). The court found that these behaviors were likely caused by Father's statements to Child during the visits. Maternal grandmother testified that once, when Father was out of jail, he came to her house to bring Child a hairbrush. He came a second time, but "things didn't work out well" because he made inappropriate statements and maternal grandmother had to ask him to leave. Father has had no visits with Child since his August 2020 return to jail. Maternal grandmother testified that there had been five phone calls either from or that included Father, but that Child often did not want to talk to him.

Ms. Ketter observed positive bonded interactions between Child and her siblings and maternal grandmother. She testified that they are loving and affectionate with each other. Child is doing very well in maternal grandmother's care and seeks her out for comfort. Ms. Ketter testified that maternal grandmother is very supportive and attentive to Child, ensuring that her educational, developmental and therapeutic needs are met.

Dr. Pepe's observations and testimony were consistent with Ms. Ketter's. Dr. Pepe conducted two interactional evaluations with Child, her sister and maternal grandmother on August 22, 2019, and in September 2020.

When Father was out of jail in 2020, he was scheduled for an evaluation with Child, but he failed to attend because he was incarcerated before the appointment. Hence, Dr. Pepe was unable to form an expert opinion about the bond between Father and Child. Father claimed that he was not notified about the evaluation, which Ms. Ketter testified would have been provided by Dr. Pepe's office, not CYF.

Dr. Pepe observed that Child had made significant progress since her April 2018 placement with maternal grandmother. She was relaxed and comfortable with maternal grandmother and exhibited multiple bonding behaviors toward her. Child stated that maternal grandmother had taken the best care of her and ensured she was safe and fed. Child exhibited a primary bond with her maternal grandmother, and she asked maternal grandmother to adopt her during the September 2020 evaluation. Despite Father's testimony that he and Child had a bond, with Child telling him that she loved him, Child did not discuss or mention Father at any time during the evaluations, even when they were discussing whom Child saw as her future caregiver. Dr. Pepe testified that this reflected Child's lack of connection with Father.

Maternal grandmother was very comforting, concerned and empathetic toward Child and consistently expressed that she wanted to care for her and her siblings permanently. Dr. Pepe opined that removing Child from maternal

grandmother's home, where she was happy, felt safe and with whom she had a primary attachment, would be very difficult for her.

Finding that terminating Father's parental rights best served Child's needs and welfare pursuant to 23 Pa.C.S. § 2511(b), the orphans' court issued an order terminating Father's parental rights to Child pursuant to 23 Pa.C.S. § 2511(a)(2). Father timely appealed and filed a contemporaneous statement of errors complained of on appeal. *See* Pa.R.A.P 1925(a)(2)(i), (b).

Father raises one issue for our review: "Whether the trial court erred and/or abused its discretion as a matter of law in concluding that the necessary burden of proof was met, and that the developmental, physical, and emotional needs and welfare of the Child would be served by termination of parental rights pursuant to 23 Pa.C.S. § 2511(b)."[5] (Father's Brief, at 11).

_____

[5] Our standard of review of this matter is well-settled:

> When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re M.M.*, 106 A.3d 114, 117 (Pa. Super. 2014) (citation omitted). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the
*(Footnote Continued Next Page)*

He argues that the court erred in relying on Dr. Pepe's expert testimony to establish that termination meets Child's needs and welfare because Dr. Pepe did not conduct an interactional evaluation of Father and Child and Father was never notified of any appointment for him to be able to do so.  (***See id.*** at 16).[6]

**II.**

**A.**

"In termination cases, the burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid." ***In re M.M.***, ***supra*** at 117 (citation omitted).  Clear and convincing evidence is "testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***Id.*** (citation and internal quotation marks omitted).

---

evidence.  If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." ***Id.*** (citations omitted).

[6] Father's argument section contains no pertinent legal citation or discussion thereof pursuant to Rule 2119(a)-(b). (***See*** Father's Brief, at 12-15); ***see*** Pa.R.A.P. 2119(a)-(b).  He observes that the "standards required for termination of parental rights are set forth in 23 Pa.C.S. §[]2511[,]" but then merely recites his version of the testimony without any pertinent legal argument. (Father's Brief, at 12).  This is wholly inadequate for our review.  Moreover, as explained above, to the extent we can discern an argument, it does not merit relief.

Section 2511 of the Adoption Act governs the involuntary termination of parental rights. *See* 23 Pa.C.S. § 2511. It requires a bifurcated analysis "in which [the court] initially focuses on the conduct of the parent under Section 2511(a). If the trial court determines that the parent's conduct warrants termination under Section 2511(a), it must then engage in an analysis of the best interests of the child under Section 2511(b)." *In re M.M.*, *supra* at 117 (citations omitted).

In this appeal, Father only challenges the orphans' court's conclusion with respect to Section 2511(b), which provides:

> The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b).

When considering Section 2511(b), "courts must examine whether termination of parental rights will destroy a necessary and beneficial relationship, thereby causing a child to suffer extreme emotional consequences." *In re J.N.M.*, 177 A.3d 937, 944 (Pa. Super. 2018), *allocatur denied*, 183 A.3d 979 (Pa. 2018) (citation and internal quotation marks omitted). The mere existence of an emotional bond does not necessarily preclude termination of parental rights. *See In re T.D.*, 949 A.2d 910, 922-

23 (Pa. Super. 2008), *appeal denied*, 970 A.2d 1148 (Pa. 2009) (balancing strong emotional bond between parent and child against parent's inability to serve child's needs and affirming termination of parental rights). "[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent." *In re M.M.*, *supra* at 118 (citation omitted). "[A] parent's basic constitutional right to the custody and rearing of ... her child is converted, upon the failure to fulfill ... her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B., N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004), *appeal denied*, 872 A.2d 1200 (Pa. 2005) (internal citations omitted). It is sufficient for the orphans' court to rely on the opinions of social workers and caseworkers when evaluating the impact that termination of parental rights will have on a child. *See In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010).

**B.**

The orphans' court explains:

> At the time of the hearing, Child had been in placement for three years. During that period, Father's visitation and communication with Child has been extremely limited, in part due to Father's repeated and lengthy incarceration, and in part due to Father's failure to pursue visitation at times he was not incarcerated. When visits have occurred, they have affected Child negatively, and Child currently declines to speak to Father on the phone when he calls.

Meanwhile, Child has made progress and done well in maternal grandmother's care, without any ongoing contact with Father. Indeed, whatever the status of any bond Child shares with Father, it was not important enough to Child for her to mention Father at all in either of her two evaluations with Dr. Pepe.

Given the above evidence, the court properly inferred that Child's bond with Father, if it exists at all, is neither necessary nor beneficial. The court properly concluded that severing this bond will not be detrimental to Father.

Given Father's failure to maintain frequent, reliable, and positive contact with Child, Father's lack of progress toward his service plan goals, and Child's length of time in placement, the court justifiably concluded that Child's need for safety, permanency, and stability outweighs the possible benefit to her of maintaining any relationship she may have with Father.

(Orphans' Ct. Op., at 8-10). We discern no abuse of discretion.

Father argues that he was not provided with notice of the interactional evaluation with Dr. Pepe and that, because no evaluation was performed, Dr. Pepe was unable to form an opinion as to the bond between him and Child, rendering the evidence insufficient. (*See* Father's Brief, at 16). At the time the appointment was scheduled, Father could not attend because he was incarcerated on the appointed date due to his own recidivist criminal activity. (*See* N.T. Hearing, 4/08/21, at 52, 66, 105). While there is a dispute as to whether he received notice when that evaluation was to be performed, it is well-settled that, "[i]n analyzing the parent-child bond, the orphans' court is not required by statute or precedent to order a formal bonding evaluation be performed by an expert." *In re K.K.R.-S.*, 958 A.2d 529, 533 (Pa. Super. 2008). Even assuming that Father was not provided with notice of the

evaluation as he claims, because having a formal evaluation was not required, this allegation is not persuasive. **See id.** Accordingly, we agree with the trial court's observation that "[g]iven the facts of this matter, [it] was justified in reaching its conclusion without such an evaluation." (Orphans' Ct. Op., at 9 n.30) (citing)).

Further, the court's decision is supported by the record. Child has lived with maternal grandmother for over three years and "has little to no contact with [Father]." (N.T. Hearing, 5/21/21, at 19); (**see** N.T. Hearing, 4/08/21, at 172, 176, 181). Child did not mention Father in either of her evaluation appointments, even when she was asked about her future caregiver. (**See** N.T. Hearing, 4/08/21, at 63, 70-71). Dr. Pepe testified that this spoke to Child's lack of connection with Father. (**See id.** at 71).

Although Father testified that he and Child share a bond, Ms. Keller advised that while out of jail, when visits at maternal grandmother's home had to be changed to CYF because of Father's demeanor and inappropriate statements, he failed to attend any visits with Child. (**See** N.T. Hearing, 5/21/21, at 20, 22-23, 25, 27-28, 104-05). At the two visits with Father in jail in 2019, Child "experienced a great deal of trauma," becoming "extremely upset," screaming, yelling and climbing the walls. (**Id.** at 26). Since returning to jail in August 2020, Father has had no further visits with Child and the few times he has telephoned, Child has not wanted to speak with him. (**See id.** at 106-07).

Dr. Pepe testified that Child has made significant progress since her placement with maternal grandmother in April 2018. (*See* N.T. Hearing, 4/08/21, at 53). Child was relaxed, comfortable and exhibited multiple bonding behaviors towards maternal grandmother, reporting that living with maternal grandmother is good because she takes the best care of her and ensures she is fed and safe. (*See id.* at 54, 60, 61). Maternal grandmother ensures that Child's educational, medical and therapeutic needs are met. (*See* N.T. Hearing, 5/21/21, at 50-52). She cares for Child and her two siblings, and they are loving and affectionate toward each other. Child looks to maternal grandmother for comfort. (*See id.*). Child exhibited a primary bond with maternal grandmother and asked her to adopt her during the September 2020 evaluation. (*See* N.T. Hearing, 4/08/21, at 60). Maternal grandmother was comforting to Child, concerned for her and consistently stated she wanted to care for her permanently. (*See id.* at 54, 61). She is an adoptive resource that would provide stability and is an "appropriate permanent placement for the Children." (*Id.* at 54). Removing Child from maternal grandmother's care would be very difficult for her. (*See id.* at 63).

Based on the foregoing, the court's findings are supported by evidence presented at the hearings. Furthermore, we defer to the court's credibility determinations and discern no abuse of discretion in its findings. Accordingly, we conclude that the court did not abuse its discretion in terminating Father's parental rights to the Child pursuant to Section 2511(b).

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:  11/22/2021