J-S45001-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: K.S., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: K.S., SR., FATHER | : | |
| | : | No. 1144 MDA 2024 |

Appeal from the Decree Entered July 24, 2024
In the Court of Common Pleas of Lycoming County Orphans' Court at
No(s):  2022-6820

| | | |
|---|---|---|
| IN RE: L.S., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: K.S., SR., FATHER | : | |
| | : | |
| | : | No. 1145 MDA 2024 |

Appeal from the Decree Entered July 24, 2024
In the Court of Common Pleas of Lycoming County Orphans' Court at
No(s):  2022-6821

BEFORE:  OLSON, J., DUBOW, J., and McLAUGHLIN, J.

MEMORANDUM BY OLSON, J.:                    **FILED: JANUARY 16, 2025**

K.S., Sr. ("Father"), appeals from the July 24, 2024 decrees that involuntarily terminated his parental rights to his son, K.S., and daughter, L.S., who are twin children born in February 2019 (collectively, "the Children").[1]  Upon careful review, we affirm.

---

[1] By separate decrees entered February 23, 2023, the court involuntarily terminated the parental rights of the Children's biological mother, C.M. ("Mother").  She did not appeal.

We glean the relevant factual and procedural history from the certified record. The Lycoming County Children and Youth Services ("CYS") first became involved with this family in April 2021, when the Children, who were two years old at the time, "'were seen playing alone on the playground after getting out of the home.'" *In re K.S.*, 305 A.3d 967, at *1 (Pa. Super. 2023) (unpublished memorandum), *citing* Orphans' Court Opinion, 2/23/23, at 1-6. The same month, the Children were observed "'playing near and hanging out of an open [second] story window, and were found home alone when [CYS] workers responded.'" *Id.*

Thereafter, CYS implemented a safety plan wherein paternal grandmother would reside in the family's home to prevent Father and Mother from having unsupervised contact with the Children. *See id.* However, on July 1, 2021, Mother violated the safety plan, and on July 21, 2021, the court adjudicated the Children dependent. *See id.*

Throughout the Children's dependencies, the court largely determined that Father had made minimal to no progress in alleviating the circumstances that brought the Children into care. On September 9, 2022, CYS filed petitions seeking the involuntary termination of Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).

The court conducted a hearing on CYS's petitions on February 8, 2023. The orphans' court entered decrees involuntarily terminating Father's parental

rights to the Children on February 23, 2023, pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b), which he timely appealed.

On September 6, 2023, this Court vacated the decrees, in part, and affirmed in part. *See K.S.*, 305 A.3d at *1. Specifically, we affirmed the decrees pursuant to Section 2511(a)(8), and explained as follows.

> At the time [CYS] filed the termination petition[s] in September 2022, the [C]hildren had been removed from the parents' care, at least twelve months had elapsed, the conditions that led to placement (Father's housing, employment, and domestic violence concerns) continued to exist, and Father, based on his conduct, did not demonstrate a present ability to meet the [C]hildren's needs and welfare, thereby demonstrating that termination would best serve the [C]hildren's needs and welfare.

*Id.* at *7.

However, the learned panel concluded that the orphans' court abused its discretion regarding Section 2511(b) because it did not properly consider the factors highlighted by our Supreme Court. *See generally Interest of K.T.*, 296 A.3d 1085, 1114-1115 (Pa. 2023) (clarifying the standards for Pennsylvania courts applying Section 2511(b)). Specifically, this Court emphasized that the record did not contain "any meaningful testimony concerning the nature of the bond between the Children and Father or the effects of termination on the Children" and that "*K.T.* requires a fuller exploration of the nature of the bond, if any[.]" *K.S.*, 305 A.3d at *8. The panel also highlighted the lack of evidence of a bond between the Children and their foster family and emphasized that they had resided with the foster parents for only four months at the time of the hearing. *See id.* Finally, the

court acknowledged that a bonding evaluation had been scheduled for Father and the Children but, for reasons not specified by the orphans' court, it never occurred. *See id.* at \*9. Accordingly, this Court vacated the decrees involuntarily terminating Father's parental rights to the Children solely on the basis of Section 2511(b) and remanded the matter to the orphans' court to conduct a new hearing regarding Section 2511(b). *See id.*

Upon remand, Father petitioned for a bonding evaluation in December 2023, which the orphans' court granted on January 10, 2024. In order to ensure objectivity, the orphans' court ordered the bonding evaluation to be conducted by a neutral, qualified evaluator not affiliated with the prior entity that attempted to perform a bonding evaluation with Father prior to the initial termination hearing in February 2023. The court further ordered a bonding evaluation with the Children and their foster parents who they started residing with in July 2023, approximately five months after the initial termination hearing.

On May 29, 2024, the orphans' court conducted the required hearing wherein CYS presented the testimony of licensed clinical psychologist, Michael W. Gillum, MA, who was retained to perform the above-referenced bonding

evaluations; the secretary for Mr. Gillum's office, Chloe Gillum; and CYS caseworker, Tara Longenberger. [2, 3]   Father testified on his own behalf.

Mr. Gillum testified that on March 25, 2024, Father completed the interview and assessment portion of his bonding evaluation.  *See* N.T., 5/29/24, at 5, 25-35.  Ms. Gillum attested that, while at the office, Father requested that his observation period with the Children occur on a different day than the observation of the Children with their foster parents.  *See id.* at 5-8, 25.  Ms. Gillum reported that Father and the Children's foster parents had both been scheduled for Thursday, March 28, 2024, for their respective observation periods with the Children.  *See id.* at 6-8.  Because Friday, March 29, 2024, was Good Friday, wherein Mr. Gillum's office would normally be closed, Ms. Gillum could not confirm with Father before he left the office that they would be able to accommodate his request.  *See id.* at 7, 15.

_____

[2] As noted previously by this Court, the orphans' court appointed the Children's guardian *ad litem* ("GAL") from the dependency proceedings as the Children's legal interest counsel.  *See* Orphans' Court Orders, 10/26/22.  In its orders appointing the Children's legal interest counsel, the orphans' court determined that the Children's legal and best interests do not conflict thereby permitting this dual representation.  *See id.*; *see also In re Adoption of K.M.G.,*240 A.3d 1218, 1236 (Pa. 2020) ("[T]he orphans' court must determine whether counsel can represent the dual interests before appointing an individual to serve as GAL/[legal interest counsel] for a child.").  Accordingly, the orphans' court satisfied the mandate provided by 23 Pa.C.S.A. § 2313(a).

[3] The orphans' court accepted Mr. Gillum as an expert in the field of bonding evaluations.  *See* N.T., 5/29/24, at 23.  CYS also introduced Mr. Gillum's April 18, 2024 report regarding the bonding evaluations which the orphans' court admitted as an exhibit.

Accordingly, she testified that she informed Father that she would call him to let him know the new date and time of his appointment. ***See id.*** at 15.

Ms. Gillum then testified that on March 26, 2024, she telephoned Father and left a voicemail for him stating that Mr. Gillum would accommodate Father's request and conduct his observation period of the bonding evaluation on Friday, March 29, 2024, at 11:00 a.m. ***See id.*** at 7. However, Father appeared at Mr. Gillum's office for the evaluation on March 28th, the original date that it was scheduled. ***See id.*** at 8. According to Ms. Gillum and Mr. Gillum, Father confirmed that he received the voicemail, and Ms. Gillum restated to Father that the appointment was set for the following day at 11:00 a.m., and Father confirmed that he would return at that time. ***See id.*** at 8-9, 25.

However, Father failed to appear for his appointment the following day. ***See id.*** at 9-10, 25. Ms. Gillum averred that she opened the office around 10:00 a.m. and the Children arrived approximately one hour later. ***See id.*** at 9. They waited for roughly 45 minutes and then Mr. Gillum dismissed the Children as Father did not appear. ***See id.*** Ms. Gillum testified that she stayed at the office until approximately 1:30 p.m., and that Father failed to appear and failed to call during that time. ***See id.*** at 9-10.

Father testified that his attorney mailed him letters to make him aware of when the bonding evaluation would occur with Mr. Gillum. ***See id.*** at 54-55. The initial two letters, dated February 9, 2024, and March 6, 2024, stated that

- 6 -

Father was scheduled for observation with the Children on March 29, 2024, at 2:00 p.m. *See id.* However, the final letter, dated March 7, 2024, informed Father that his observation period was moved to March 28, 2024, at 2:00 p.m. *See id.* Father confirmed that he appeared for the assessment and interview portion of the bonding evaluation on March 25, 2024, and that a conversation occurred wherein Father stated that he would prefer to meet with the Children on a different day than the foster parents. *See id.* at 56-58. Father denied receiving a voicemail from Ms. Gillum that provided him with an update regarding when his observation period would occur. *See id.* at 62. He further testified that although Ms. Gillum informed him, on March 28, 2024, that his observation period was scheduled for the following day, she did not provide him with the time of the appointment. *See id.* at 59-62. Therefore, Father testified that he arrived at Mr. Gillum's office at 2 p.m. on March 29, 2024, and the doors were locked. *See id.* at 62. At the May 29, 2024 hearing, Father did not provide any testimony with respect to any bond he has with the Children.

Mr. Gillum crafted a report and testified regarding the individual assessment Father completed, including his interview with Father, and the bonding evaluation with the foster parents. Mr. Gillum testified that Father was "somewhat unusual" in his interview. *See id.* at 26. He reported that when he asked Father about parenting the Children, he would respond that "God would take care of everything[,] rather than respond to the specific

question [asked]." *See id.* Mr. Gillum testified that he found it difficult to get direct, clear responses from Father, and that his answers were often inconsistent. *See id.* Mr. Gillum also reported that Father repeatedly stated that he had "beat CYS." *See id.* at 27.

During the interview, Mr. Gillum stated that Father never said he loved or missed the Children, and that Father did not provide any information about his relationship with the Children or how he would meet their needs if they were reunified with him. *See id.* at 28-29. Mr. Gillum also testified that Father was not cooperative with the psychological testing that was administered because Father denied any psychological issues or symptoms and Father reported that he does not have any negative attributes. *See id.* at 33-34. Mr. Gillum opined that Father likely has "mixed personality disorder with antisocial histrionic and narcissistic personality features." *See id.* at 34.

Based on all the information he gathered, Mr. Gillum concluded that there is no bond between the Children and Father. *See id.* at 37. He further recommended in his report that "Father have no contact with [the Children]." *See* CYS Exhibit 2, 4/18/24, at 8. Finally, Mr. Gillum opined that he believes Father sees what is happening with the court and the Children as "a bit of a game" and that "he intentionally missed the observation." N.T., 5/29/24, at 37-39. Accordingly, Mr. Gillum testified that he "sees no reason for [Father] to be involved with [the Children] and . . . would not recommend another attempt at a bonding evaluation." *Id.* at 49.

Regarding the Children's foster parents, Mr. Gillum reported that they were able to "offer me detailed information about all aspects of the [C]hildren." *Id.* at 32. Mr. Gillum also concluded the Children are "bonded to them much like any child would be bonded to their parents." *Id.*

Ms. Longenberger, who had been assigned to the case since July 2021, also testified, detailing that Father did not take advantage of his supervised visitation opportunities with the Children. *See id.* at 50-51. She reported that Father was offered two one-hour visits per week, and over the course of the Children's dependencies, *i.e.* July 2021 to February 2023, he inconsistently attended these visitations, only spending a total of 3.54 days with the Children. *See id.* at 51. She further testified that Father has not contacted CYS to inquire about the Children in well over a year. *See id.*

By decrees dated and entered on July 24, 2024, the orphans' court involuntarily terminated Father's parental rights to the Children. The orphans' court filed opinions accompanying the decrees that analyzed Section 2511(b), while relying on its earlier analysis of Section 2511(a)(8), which was affirmed by this Court on appeal. *See K.S.*, 305 A.3d at *9.

Father timely filed notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On August 26, 2024, the orphans' court filed brief opinions that asked this Court to affirm the decrees involuntarily terminating Father's parental rights to the Children and referred this Court to its comprehensive analysis in its opinions

accompanying the July 24, 2024 decrees. This Court consolidated Father's

appeals *sua sponte* on August 29, 2024.

On appeal, Father presents one issue:

Whether the orphans' court erred in finding that CYS established by clear and convincing evidence that the developmental, physical, and emotional needs and welfare of the Children will be best served by termination of Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(b) when Father was never observed with the Children to make a determination as to a bond?

Father's Brief at 7 (cleaned up).[4]

Our standard of review in this context is well-settled:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. This standard of review corresponds to the standard employed in dependency cases, and requires appellate courts to accept the findings of fact and credibility determinations of the [orphans'] court if they are supported by the record, but it does not require the appellate court to accept the lower court's inferences or conclusions of law. That is, if the factual findings are supported, we must determine whether the [orphans'] court made an error of law or abused its discretion. An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion; we reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will. Thus, absent an abuse of discretion, an error of law, or insufficient evidentiary support for the [orphans'] court's decision, the decree must stand. We have previously emphasized our deference to

_____

[4] Based upon this Court's prior disposition, and Father's failure to raise any issue with regard to Section 2511(a) in his concise statement or statements of questions presented in his brief, we conclude that the orphans' court did not abuse its discretion or commit an error of law pursuant to Section 2511(a)(8). *See In re M.Z.T.M.W.*, 163 A.3d 462, 466 (Pa. Super. 2017) (issues not included in a concise statement of errors complained of on appeal and statement of questions involved are subject to mandatory waiver).

[orphans'] courts that often have first-hand observations of the parties spanning multiple hearings. However, we must employ a broad, comprehensive review of the record in order to determine whether the [orphans'] court's decision is supported by competent evidence.

*In re Adoption of C.M.*, 255 A.3d 343, 358-359 (Pa. 2021) (quotation marks, brackets, and citations omitted).

Termination of parental rights is governed by 23 Pa.C.S.A. § 2511, which requires a bifurcated analysis. *See id.* at 359. "Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in section 2511(a)." *In re C.M.K.*, 203 A.3d 258, 261-262 (Pa. Super. 2019). If the orphans' court determines the petitioner established grounds for termination under Section 2511(a) by clear and convincing evidence, then the court then must assess the petition under Section 2511(b), which focuses on the child's needs and welfare. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). Clear and convincing evidence is evidence that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (quotation marks and citations omitted).

If sufficient grounds for termination are found pursuant to Section 2511(a), the court must turn to Section 2511(b), which states the following:

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental,

- 11 -

physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b).

In **In re E.M.**, 620 A.2d 481 (Pa. 1993), our Supreme Court first recognized that the "emotional needs and welfare" analysis under Section 2511(b) must include, in part, an evaluation of the child's bond with his or her parent.  The Court has subsequently clarified that the effect on the child of severing a bond with a parent requires "a determination of whether the bond is necessary and beneficial to the child, *i.e.*, whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." **In the Interest of K.T.**, 296 A.3d 1085 (Pa. 2023).

Our Supreme Court has explained:

Severance of a "necessary and beneficial" bond would predictably cause more than the "adverse" impact that, unfortunately, may occur whenever a bond is present.  By contrast, severance of a necessary and beneficial relationship is the kind of loss that would predictably cause "extreme emotional consequences" or significant, irreparable harm.  **See E.M.**, 620 A.2d at 484 ("a beneficial bonding could exist between a parent and child, such that, if the bond were broken, the child could suffer extreme emotional consequences").

**K.T.**, 296 A.3d at 1109-1110 (some citations omitted).  As such, the **K.T.** Court distinguished "extreme emotional consequences" from an "adverse

- 12 -

impact" to the child when parental rights are terminated. *Id.* at 1111. Moreover, the Court cautioned that a trial court "must not truncate its analysis and preclude severance based solely on evidence of an 'adverse' or 'detrimental' impact to the child." *Id.* at 1114. As such, the Court concluded, "to grant termination when a parental bond exists, there must be clear and convincing evidence that the bond is not necessary and beneficial." *Id.*

Furthermore, the *K.T.* Court reaffirmed that caselaw "indicates that bond, plus permanency, stability and all 'intangible' factors may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare, and thus are all of 'primary' importance in the Section 2511(b) analysis." *K.T.*, 296 A.3d at 1109. For instance, if relevant in a case, a trial court "can equally emphasize the safety needs of the child" in its analysis under Section 2511(b). *See In re M.M.*, 106 A.3d 114, 118 (Pa. Super. 2014).

With his sole issue on appeal, Father argues that the orphans' court erred in finding that CYS established by clear and convincing evidence that the developmental, physical, and emotional needs and welfare of the Children would best be served by termination of his parental rights pursuant to Section 2511(b) since Mr. Gillum did not observe him with the Children. *See* Father's Brief at 18. He posits that he did not intentionally miss the observation portion of the bonding evaluation. *See id.* at 21-22. Specifically, Father argues that, because Mr. Gillum did not perform the bonding evaluation, at no fault of his

own, Mr. Gillum's conclusions should be questioned and, therefore, CYS did not provide sufficient evidence for the orphans' court to involuntarily terminate his parental rights to the Children pursuant to Section 2511(b). ***See id.*** at 23.

Father also baldly asserts that he has a bond with the Children and that breaking it would be traumatic for them. ***See id.*** at 20. Father relies on testimony from the initial termination hearing on February 8, 2023, wherein visitation worker Heather Goodbrod testified that Father interacted with the Children and showed them love and affection at visits. ***See id.***, *citing* N.T., 2/8/23, at 34-35.

Father further contends that the Children have been in various placements, and, that by June 2024, they were no longer residing with the foster parents who completed the bonding evaluation. ***See*** Father's Brief at 20-21. Finally, Father argues that he did not see the Children in over a year because after CYS allowed a final visit immediately following the involuntary termination of his parental rights in February 2023, he then had to wait for this Court to make a decision regarding his appeal, and then CYS opposed his petition for a bonding evaluation. ***See id.*** at 21.

> The orphans' court reasoned as follows regarding Section 2511(b):
>
> Most notable to the court, however, was Mr. Gillum's testimony that Father had difficulty answering what he thought he needed to do to work on reunification with the Children. According to Mr. Gillum, Father provided no information about how he planned to meet the needs of the Children and did not speak about his relationship with the Children or their interactions with each other.

When asked about the Children's personalities, Father only stated that his son was "kind of laid back" and his daughter was "high energy." Father made no statements of affection or affirmation, such as "I love them" or "I miss them" and made no acknowledgement of the Children's trauma due to his and Mother's actions.

. . .

Although the Superior Court remanded the case for this court to evaluate whether termination of Father's parental rights will meet the Children's needs and welfare using the criteria outlined in ***Interest of K.T., supra***, and this process was hindered by the inability of the evaluator to observe Father's interactions with the Children in order to form an opinion and give testimony regarding the bond, if any, between them, the court finds there was sufficient information presented to conclude that termination of Father's parental rights will not "destroy a necessary and beneficial relationship, thereby causing the child[ren] to suffer extreme emotional consequences." ***K.T.***, 296 A.3d at 1110 (quotation marks and citation omitted). When Mr. Gillum observed the Children with their then-foster parents, the Children sought out both foster parents. They wanted to be physically close to them and wanted the adults to play with them or read to them. They did not exhibit any fear of the foster parents. The foster parents had gone to great lengths to obtain the physical and mental health treatment the Children needed, and, as a result, the Children had formed a very healthy and appropriate bond with them. Additionally, Mr. Gillum testified that the Children brought up previous foster families, but never Father [], signifying to the court that they do not identify Father as a caregiver or a person of importance in their lives, and the court finds that there is no necessary and beneficial bond with Father in the eyes of the Children.

. . .

Given the age of the Children, the length of time which they have been in placement, along with the extremely limited interaction Father has had with them in the past three years, the court is satisfied that it is in the best interest of the Children to terminate Father's parental rights and that doing so will have no adverse effects on their developmental, physical, and emotional needs and welfare.

Orphans' Court Opinion, 7/24/24, at 5-7 (cleaned up). Further, in its Rule 1925(a) opinion, the orphans' court confirmed that it was "Father's failure to appear on the date and time he was to be observed with the Child[ren]" which precluded the scheduled observation by Mr. Gillum. Orphans' Court Opinion, 8/26/24, at 2 (unpaginated).

After careful review, we discern no abuse of discretion in the orphans' court's reasoning.[5] Father's contention that he shares a parental bond with the Children is belied by the certified record. While Father contends that it was not his fault for not seeing the Children following his final visit in February 2023, there is no evidence that he attempted to see them absent his request for the bonding evaluation. Indeed, Ms. Longenberger testified that Father had not contacted CYS in "well over a year." N.T., 5/29/24, at 51.

Further, although Ms. Goodbrod testified at the first termination hearing that Father "demonstrates love" for the Children at visits, she further testified about various issues concerning Father, including the following: (1) he was often late for visits; (2) he would not change the Children's diapers unless prompted and once refused, indicating that his visit was over; and (3) he often

_____

[5] To the extent Father asserts that the Children no longer reside with the foster parents that participated in the bonding evaluation with Mr. Gillum, there is no evidence in the certified record to support this assertion. Therefore, we cannot consider it. *See Commonwealth v. Preston*, 904 A.2d 1, 6 (Pa. Super. 2006) (*en banc*) (appellate courts may only consider materials present in the certified record).

let the Children play around him instead of engaging the Children. *See* N.T., 2/8/23, at 34-35. As related *supra*, Ms. Longenberger testified that Father failed to take advantage of his visitation opportunities, and he never progressed beyond his initial visitation schedule of two one-hour supervised visits per week. *See id.* at 36; *see also* N.T., 5/29/24, at 50-51.

Further, Mr. Gillum testified as follows regarding whether the Children and Father share a bond:

> Well, as noted, [] there was not an observation with the Children and Father because [Father] failed to show up for the appointment. Based on the fact that he hasn't seen the Children in over a year and the reports that the Children never mention him or their [m]other, they never bring them up in conversation -- although the Children will bring up past foster parents and foster families and discuss them -- but according to the record there's no discussion of their biological parents by the Children. So that's a bit unusual. We usually expect them to reference their parents at times at least.
>
> So, given the history of visitation where [Father] missed a lot of visits -- which he told me was because he had adult things to do -- yeah, I would say that given his history of not being around the [Children], that there's no bond, essentially, between him and the Children[.]

N.T., 5/29/24, at 36-37 (cleaned up). Relatedly, in his report, Mr. Gillum reported that Father "did not state that he loved the Children nor did he mention any affection for the Children. He was unable or unwilling to discuss parenting and the Children themselves beyond very minimal descriptions." CYS Exhibit 2, 4/18/24, at 4. Although the Children have displayed behavioral issues that require intervention, Father has not expressed how he would parent the Children in any meaningful way. *See* N.T, 5/29/24, at 32. Father

also provided no testimony at the May 29, 2024 hearing, regarding any bond he shares with the Children. Instead, his testimony focused solely on his version of events that caused him to miss the observation portion of the bonding evaluation. ***See generally id.*** at 52-64.

In contrast, Mr. Gillum testified that the Children share a parental bond with their foster parents. ***See id.*** at 32. Mr. Gillum testified that the Children "sought out both adults. . . . [I]t was obvious the [C]hildren had no fears of these adults and were actually very bonded with them." ***Id.*** Based on the foregoing, the orphans' court was well within its discretion to determine that involuntarily terminating Father's parental rights would not sever a necessary and beneficial bond. ***See K.T.***, 296 A.3d at 1114.

Regarding Father's contention that he did not intentionally miss the observation portion of his bonding evaluation, the orphans' court determined that whether intentional or not, it was Father's own fault that he missed the appointment. Indeed, testimony by Mr. Gillum and Ms. Gillum confirmed that they informed Father that, at his request, they rescheduled his appointment for Friday March 29, 2024, at 11 a.m. ***See*** N.T., 5/29/24, at 6-8. It is clear that the orphans' court found this credible and that it found Father's version of the events incredible. Nevertheless, even absent the observation portion of the bonding evaluation, as evidenced above, CYS proffered sufficient evidence for the orphans' court to involuntarily terminate Father's parental rights pursuant to Section 2511(b).

Based on the foregoing, the record evidence amply demonstrates that the termination of Father's parental rights will serve the developmental, physical, and emotional needs and welfare of the Children. Therefore, we discern no abuse of discretion by the court in terminating Father's parental rights pursuant to Section 2511(b).

Accordingly, we affirm the decrees terminating Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(8) and (b).

Decrees affirmed.

Judgment Entered.

_____
Benjamin D. Kohler, Esq.
Prothonotary

Date: 1/16/2025