J-S64030-14

2014 PA Super 266

IN RE: M.M., A MINOR

APPEAL OF: R.H., BIRTH MOTHER

IN THE SUPERIOR COURT OF
PENNSYLVANIA

No. 1019 WDA 2014

Appeal from the Order May 28, 2014
In the Court of Common Pleas of Allegheny County
Orphans' Court at No(s): TPR 191 OF 2003

IN RE: I.M., A MINOR

APPEAL OF: R.H., BIRTH MOTHER

IN THE SUPERIOR COURT OF
PENNSYLVANIA

No. 1020 WDA 2014

Appeal from the Order May 28, 2014
In the Court of Common Pleas of Allegheny County
Orphans' Court at No(s): TPR 192 2013

IN RE: T.M., JR., A MINOR

APPEAL OF: R.H., BIRTH MOTHER

IN THE SUPERIOR COURT OF
PENNSYLVANIA

No. 1036 WDA 2014

Appeal from the Order May 28, 2014
In the Court of Common Pleas of Allegheny County
Orphans' Court at No(s): TPR 1901 OF 2013

BEFORE: GANTMAN, P.J., BENDER, P.J.E., and LAZARUS, J.

OPINION BY BENDER, P.J.E.: **FILED DECEMBER 2, 2014**

Appellant, R.H. ("Mother"), appeals from the orders involuntarily terminating her parental rights to M.M. (born in November of 2003), I.M. (born in December of 2005), and T.M. (born in November of 2002) (the

"Children") pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b).[1]   We

affirm.

In its opinion, the orphans' court set forth the following extensive

history of this case:

CYF [the Allegheny County Office of Children, Youth and Families] first became involved with the case in November 2003, when it was reported that Mother was abusing the children's elder sibling, who is not a party to this case.  That case was opened in January 2004, and the family received services.  At that point, the Court was not involved.  A second case was opened in June 2004, when Mother left children T.M. and M.M. with [M]aternal [A]unt and grandmother, who contacted CYF and asked for their removal.[3]   In August 2004, T.M. and M.M. were adjudicated dependent.  The adjudication was based on, among other things[,] Mother's use of crack cocaine and marijuana and the alleged maltreatment of the children.  The home was also unlivable, with garbage all over the floor and no utilities in the home.  CYF established Family Service Plan goals during the June 2003 [through] June 2007 period.  The goals included: obtain safe and appropriate housing with utilities, eliminate verbal and physical abuse and use alternative methods of discipline, to stay in contact and cooperate with the agency.  Mother also had a goal to achieve sobriety and maintain recovery from substance abuse.  This goal was achieved in December 2005.  Although CYF provided significant services, there was limited progress.  In March and April of 2006, the children were returned to their [M]other, but the case was kept open so that CYF could monitor for physical maltreatment and Mother's drug use.  In November 2006, the Court closed its case; CYF kept its case open until May 2007.

_____
[3] I.M. was not yet born.

_____

[1]   Although T.M. ("Father") was named in the petition seeking the involuntarily termination of his and Mother's parental rights, during the course of the hearings, Father withdrew his opposition to the termination of his parental rights and is not a party to this appeal.

The second time a case was opened was in January 2009. The Court issued an Emergency Custody Authorization for I.M., who was discovered wandering outside, alone in a diaper. The home was found to be in a deplorable condition with rotten food in the kitchen, inadequate bedding, and clothing piled everywhere. All three children were placed with maternal grandmother, who was living in the home; Mother was forbidden from residing there. The children also displayed injuries consistent with those intentionally inflicted by a cord or a belt; M.M. had a burn mark on her right forearm that appeared to be from an iron. There were additional concerns about the children's medical health. They were not up to date on their immunizations. Mother was charged with two counts of simple assault and two counts of endangering the welfare of children. She was convicted in May 2010 and sentenced to two years['] probation. The children were adjudicated dependent on March 4, 2009. Again, goals were established and services implemented. The agency and the Court closed the case on August 17, 2009.

The third time the case was opened was in Februaiy 2010, when CYF received a referral that the children had missed a week of school. There was also an allegation that I.M. was outside again, in dirty pajamas, looking for food. CYF investigated and found there to be lack of clothing, and inadequate supervision and housing. Family Group Decision Making was implemented to assist Mother. ChildLines were filed in December 2010, and Mother was charged with endangering the welfare of the [C]hildren. She pleaded guilty and [was] placed on five years['] probation. CYF reestablished the Family Service Plan goals: supervision of the [C]hildren, not leaving the [C]hildren with unsuitable caregivers, no pain medication without appropriate supervision, contact and cooperation with CYF, ensure school attendance, and prevent neglect. The case was closed in May 2011.

In May 2012, there was another referral to the agency regarding lack of supervision, and deplorable living conditions. This time, there were utilities and food in the house. Despite Mother reporting that T.M. nearly died when he took acetaminophen and alcohol, CYF did not make the case court-active. However, a month later, a probation officer reported that mother tested positive for THC and was not compliant with her mental health and drug program. When the police contacted the

agency, the agency investigated the home and found, again, deplorable housing conditions, no running water, feces in the toilet, children in dirty clothes and no beds. These findings were similar [to] those in 2004, 2009 and 2010, but CYF did not immediately remove the [C]hildren. Instead, Family Group Decision Making was put back in place. Two days later, however, an ECA was sought and obtained. The [C]hildren have been out of Mother's care since June 29, 2012. Mother was charged and convicted for endangering the welfare of children. On March 5, 2013, Mother was sentenced to two to five years in prison. The latest dependency adjudication was [held] on July 31, 2012. CYF filed its TPR petition on November 2013. The children have resided with maternal aunt since August 30, 2012.

Orphans' Court Opinion (O.C.O.), 7/28/14, at 3-6 (citations to the record omitted).

The hearings concerning this case were held in April and May of 2014. In addition to Mother's testimony, the court heard testimony from Michael Komorowski, a CYF caseworker, and from psychologist, Dr. Eric Bernstein. Based upon the evidence and testimony provided, the orphans' court entered its orders terminating Mother's parental rights to the Children.

Mother filed timely notices of appeal and a concise statement of errors complained of on appeal in compliance with Pa.R.A.P. 1925(a)(2)(i) and (b). She raises a single issue: "Did the [orphans'] court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of the [C]hildren pursuant to 23 Pa.C.S. § 2511(b)?" Mother's brief at 9.

Our standard of review regarding orders terminating parental rights is as follows:

> When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re S.H.*, 879 A.2d 802, 805 (Pa. Super. 2005). In termination cases, the burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid.

*Id.* at 806. We have previously stated:

> The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*In re J.L.C. & J.R.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003).

The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence. *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004). If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result. *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa. Super. 2003). Additionally, this Court "need only agree with [the trial court's] decision as to any one subsection in order to affirm the termination of parental rights." *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004).

The termination of parental rights is controlled by 23 Pa.C.S. § 2511. Under this statute, the trial court must engage in a bifurcated process in which it initially focuses on the conduct of the parent under Section 2511(a). *See In the Interest of B.C.*, 36 A.3d 601 (Pa. Super. 2012). If the trial court determines that the parent's conduct warrants termination under Section 2511(a), it must then engage in an analysis of the best interests of the child under Section 2511(b). *See id.*

In the instant case, Mother does not challenge the trial court's analysis as it relates to her conduct under Section 2511(a); rather, she limits her argument to the trial court's analysis of the best interests of the Children under Section 2511(b).

Section 2511(b) provides, in pertinent part:

> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S. § 2511(b).

Pursuant to Section 2511(b), the trial court must take into account whether a natural parental bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship. *In re C.S.*, 761 A.2d 1197, 1202 (Pa. Super. 2000) (*en banc*).

In **In re C.M.S.**, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into needs and welfare of the child." In addition, we instructed that the orphans' court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. **Id.** However, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. **In re K.Z.S.**, 946 A.2d 753, 763 (Pa. Super. 2008).

While a parent's emotional bond with his or her child is a major aspect of the Subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child. The mere existence of an emotional bond does not preclude the termination of parental rights. Rather, the orphans' court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." As we explained in **In re A.S.**, 11 A.3d 473, 483 (Pa. Super. 2010):

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

**In re N.A.M.**, 33 A.3d 95, 103 (Pa. Super. 2011) (citation omitted).

Mother argues that her involvement with CYF "prior to May 2012 should not be the focus of any review of this case." Mother's brief at 16. She also contends that her imprisonment should not be the focus of our review in that her term of incarceration was to end about one month after the final termination hearing. **Id.** Mother also asserts that the Children

"love their [M]other and want to maintain their relationship and bond with [her]." ***Id.*** Additionally, Mother contends that Dr. Bernstein's testimony in which he discusses each child's statements to him about their relationship with Mother, supports a finding that the Children miss her and "want to maintain a relationship with her." ***Id.*** Mother also explains about the visitations she had with the Children while she was housed in the Allegheny County Jail and, despite the lack of visitation when she was transferred to a state correctional institution in April of 2013, she describes her contact with the Children by phone and by mail. Mother further discusses her belief that the termination will be harmful to the Children and that the court did not give "serious consideration" to the bond that exists between her and the Children, as required by the law. ***Id.*** at 18.

In its opinion, the court referenced some of Dr. Bernstein's testimony concerning the Children individually, their bond with Mother, and discussed Maternal Aunt's care of and relationship with the Children. O.C.O. at 6-7. Specifically, the court reasoned:

> Ultimately, Dr. Bernstein testified that to the extent that the [C]hildren would experience a detriment if this Court terminated Mother's rights, such a detriment would be wholly outweighed by the benefits of adoption. Although the [C]hildren indicated that they miss Mother, Dr. Bernstein testified that this might not necessarily mean that they have a meaningful bond with their Mother. Given the facts and history of this case, Dr. Bernstein testified that the bond would not be healthy nor securely attached. Maternal Aunt provides much-needed structure to the [C]hildren's lives. T.M. recognizes Maternal Aunt as a full-time caregiver and appreciates her in that role. [The Children's] primary concern is losing complete contact from

Mother. In this case, given that the foster parent is Mother's sister, a complete[] loss of contact seems extremely unlikely. Dr. Bernstein testified that Maternal Aunt could use a bit more assistance in meeting the [C]hildren's elevated needs. For example[,] Dr. Bernstein's report noted that she did not know the name of M.M.'s teacher. Nevertheless, Dr. Bernstein still feels that adopti[on] would be the most appropriate action. This Court agrees.

Maternal Aunt demonstrated appropriate parenting skills. For example, she disciplines the [C]hildren in non-physical manners, such []as removing a privilege or sending a child to the bedroom. In [a] case like this, where there is a history of child abuse, it is important to note the importance of non-physical discipline. Maternal Aunt has also implemented a routine in her home. Upon returning home from school, the [C]hildren complete chores, do their homework, and then have dinner and playtime. In Maternal Aunt's care, the [C]hildren have experienced, for the first time, real and consistent care such that they are not in harm's way. This stability has allowed the [C]hildren to grow and develop. Whether the pre-adoptive foster parent is meeting [C]hildren's emotional needs is an important question in any TPR case. Here, that answer is in the affirmative. In this case, however, this Court also notes that Maternal Aunt is meeting the [C]hildren's basic needs: shelter, food, clothing and physical health. These needs were not always met while the [C]hildren were under Mother's care and supervision. To the extent that Mother was ever able to meet these basic needs, it was only when prompted … by a multitude of CYF services, including but not limited to: drug and alcohol referrals, mental health referrals, Alliance for Infants, Three Rivers Youth in-home services. Even then, Mother mostly failed to participate in those programs. She was never able to meet the [C]hildren's needs for any length of time that could be considered consistent. And when Mother failed to provide for her [C]hildren, she did so in such an absolute way that the failure was determined to be criminal in nature.

O.C.O. at 7-8 (citations to the record omitted).

In response to Mother's arguments, it is evident that the court emphasized the Children's safety and did not focus on Mother's

incarceration. Most notably, the court examined the status of the bond between Mother and the Children, recognizing that any detriment to the Children is outweighed by their safety and security needs. Moreover, the court concluded that because Maternal Aunt is Mother's sister, "a complete[] loss of contact seems unlikely." *Id.* at 8.

The court's discussion, quoted above, reveals that the court concluded that Mother failed to provide the Children with a safe environment, and that the termination of Mother's parental rights is in the Children's best interests. *Id.* at 6. The court found that although the Children have a bond with Mother, the bond is not necessarily meaningful or healthy. *Id.* at 7. *See In re T.S.M.*, 71 A.3d 251, 268 (Pa. 2013) (stating that the strong parent-child bond was an unhealthy one that could not by itself serve as grounds to prolong foster care drift); *see also In re L.M.*, 923 A.2d 505, 512 (Pa. Super. 2007) (holding that a parent's love of her child, alone, does not preclude a termination). The court also noted that the Children are no longer in harm's way, which is allowing them "to grow and develop." O.C.O. at 8. *See In re N.A.M.*, 33 A.3d at 103 (stating that the court may emphasize the child's safety needs).

Our review of the record reveals that the court's findings are supported by evidence presented at the hearings. Furthermore, we defer to the court's credibility determinations, and discern no abuse of discretion in its findings as to credibility. *See In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012). Accordingly, we conclude that the court did not abuse

its discretion in terminating Mother's parental rights to the Children pursuant to Section 2511(b).

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/2/2014