J-S02014-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| IN THE INTEREST OF: N.R.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| APPEAL OF: M.M.H., MOTHER | : | |
| | : | |
| | : | No. 2288 EDA 2024 |

Appeal from the Decree Entered August 12, 2024
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000365-2023

| IN THE INTEREST OF: A.R.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| APPEAL OF: M.M.H., MOTHER | : | |
| | : | |
| | : | No. 2289 EDA 2024 |

Appeal from the Decree Entered August 12, 2024
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000366-2023

BEFORE: LAZARUS, P.J., DUBOW, J., and McLAUGHLIN, J.

MEMORANDUM BY LAZARUS, P.J.: **FILED MAY 7, 2025**

M.M.H. (Mother), appeals from the decrees,[1] entered in the Court of Common Pleas of Philadelphia County, Juvenile Division, involuntarily terminating her parental rights to her two children, N.R.H. (born February 2021) and A.R.H (born May 2022) (collectively, Children), pursuant to 23

---

[1] On November 13, 2024, this Court *sua sponte* consolidated Mother's appeals at 2288 EDA 2024 and 2289 EDA 2024. **See** Pa.R.A.P. 513.

Pa.C.S.A. §§ 2511(a)(1), (2), (5), (8), and (b) of the Adoption Act.[2] After careful review, we affirm.

On February 9, 2021, the Philadelphia Department of Human Services (DHS) received a General Protective Services (GPS) report alleging that Mother had recently given birth to N.R.H. The GPS report alleged that Mother was intellectually challenged and diagnosed with schizophrenia. The report indicated that Mother had previously lost custody of N.R.H.'s three siblings, one of whom was in foster care while the other two were in the care of their maternal grandmother. The reported also alleged "that there were concerns regarding [Mother's] ability to care for N[.R.]H.; that [Mother] was connected to numerous services; that she had followed up with mental health services; and that she was attending parenting education classes." Trial Court Opinion, 10/31/24, at 3. Mother was prescribed medications for her various medical conditions. While N.R.H. had not been experiencing drug withdrawal symptoms at the time of the report, N.R.H. later exhibited withdrawal symptoms from Mother's prescription medications and was hospitalized. The report further stated that Mother was unemployed, suffered from an intellectual disability, obtained all the items necessary to care for N.R.H., had been visiting N.R.H. regularly, and lived alone.

On February 17, 2021, N.R.H. was ready for discharge from the hospital, and DHS obtained an order of protective custody (OPC). N.R.H. was placed

_____

[2] See 23 Pa.C.S.A. §§ 2101-2938.

in a foster home through Bethany Christian Services. On February 19, 2021, at a shelter care hearing for N.R.H., the Honorable Vincent Furlong lifted the OPC while ordering N.R.H.'s temporary commitment to DHS to stand.[3]

On March 3, 2021, the Greater Philadelphia Community Alliance's Community Umbrella Agency (CUA) held a single case plan (SCP) meeting with Mother and L.E.W. (Father). Mother's "objectives were to engage in [Achieving Reunification Center (ARC)] services; engage in Intellectual Disability Services (IDS); engage in mental health services and follow recommendations; sign all necessary release of information (ROI); and visit [C]hildren as allowed by the court order." *Id.* at 4. The SCP goal was reunification.

On May 21, 2021, Judge Furlong held an adjudicatory hearing. That hearing was continued, and the court ordered Mother and Father have separate community visits with N.R.H. The court also referred Mother and Father to the Clinical Evaluation Unit (CEU) for drug screenings, followed by three random screenings, and home assessments of Mother's and Father's residences. On June 30, 2021, the court adjudicated N.R.H. dependent and committed him to the custody of DHS.

At a permanency hearing on January 20, 2022, the court found that N.R.H. was not "medically up to date" and was in treatment-level foster care

---

[3] Judge Furlong presided over the case from February 19, 2021, through January 20, 2022. Starting with a permanency review hearing on April 20, 2022, the case was reassigned to the Honorable John Sabatina, Jr.

through Bethany Christian Services. *Id.* at 5. The court ordered that N.R.H. remain in foster care placement and granted Mother and Father weekly supervised visits. The court also ordered Mother and Father to sign all necessary ROI for N.R.H. Mother was "to be referred to" domestic violence counseling and an IDS program. *Id.* On March 7, 2022, the CUA held an SCP meeting in which Mother and Father did not participate. Mother's "objectives were to engage with ARC services; engage in mental health services and follow recommendations; sign all necessary ROI; engage in domestic violence consultation; and visit as allowed by the court order." *Id.* at 6. The goal for N.R.H. remained reunification.

On May 4, 2022, DHS received a GPS report that A.R.H. had recently been born. While A.R.H. presented as normal and healthy, Mother was "suffering from schizophrenia and depression, for which she was not receiving treatment; [] she suffered from a seizure disorder and was cognitively challenged; [] Mother was prescribed Clonazepam; [and] Mother was transient." *Id.* There were concerns that Mother was unable to provide adequate care to A.R.H. On May 5, 2022, DHS met with Mother at the Hospital of the University of Pennsylvania, where Mother said she lacked stable housing and did not know the name of A.R.H.'s father. On May 7, 2022, Mother was unable to provide DHS with any kinship resources for A.R.H. On May 16, 2022, DHS obtained an OPC for A.R.H. Following a shelter care hearing on May 18, 2022, A.R.H. was placed in a Bethany Christian Services foster home.

On June 30, 2022, Judge Sabatina, Jr. adjudicated A.R.H. dependent and found "A[.R.]H. was without proper care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals." *Id.* at 7. The court ordered A.R.H. be fully committed to DHS. On August 30, 2022, the CUA held an SCP meeting, in which Mother did not participate. Mother's "objectives were to engage with ARC services; engage in IDS; engage in behavioral health services and follow recommendations; sign all necessary ROI; engage in domestic violence consultation; and visit as allowed by the court order." *Id.* at 8. The goal for Children was reunification.

At a permanency review hearing held on September 29, 2022, the court ordered that Children remain as committed and placed after finding N.R.H. received services through Elwyn[4] and A.R.H. received physical therapy. The court ordered Mother to have weekly supervised visits at CUA with 24-hour confirmation prior to each visit. The court ordered that all prior orders for Mother to stand. At a permanency review hearing held on December 15, 2022, the court again ordered that Children remain as committed and placed. The court ordered Mother to have weekly supervised visits at CUA with 24-hour confirmation prior to each visit. The court further ordered Mother "to

_____

[4] Elwyn is a multi-state nonprofit organization based in Elwyn, Pennsylvania, that provides "education, treatment, and support services to children and adults with autism, intellectual and developmental disabilities, and related behavioral health challenges." *About Elwyn*, https://www.elwyn.org/about-elwyn (last visited 4/4/25).

sign all necessary consents for N.R.H.'s appointments at Children's Hospital of Philadelphia (CHOP); [that] N.R.H.'s therapist was to be included, if appropriate; CUA was to make outreach to Mother; [and] CUA was to follow up with Mother's IDS referral." *Id.* at 9.

On February 28, 2023, the CUA held an SCP meeting, in which Mother did not participate. Mother's "objectives were to engage with ARC services; engage in IDS; engage in behavioral health services and follow recommendations, sign all necessary ROI; engage in domestic violence consultation; comply with court orders; obtain and maintain stable housing; and visit as allowed by the court order." *Id.* The goal for Children remained reunification. At a permanency review hearing on March 2, 2023, the court ordered that Children remain as committed and placed. It also found that Mother was living in a shelter, had completed parent education classes and other ARC services, and had received services through The Consortium.[5] The court ordered Mother to have weekly supervised visits at the agency with confirmation. Additionally,

> [t]he Court further ordered that CUA was to re-refer Mother for IDS, [and] services were to start forthwith; CUA was to re-refer Mother to domestic violence counseling through Lutheran

---

[5] The Consortium is a community health clinic in Philadelphia that provides behavioral health, substance abuse, and coordination services to adults and children. *See* THE CONSORTIUM, https://cosortiuminc.org (last visited April 16, 2025). As of the second termination hearing, Mother attended a mental health program at The Consortium at least four days a week, and had been engaged with The Consortium before her engagement with DHS. *See* N.T. Termination Hearing, 8/12/24, at 9-10.

Settlement House; CUA was to explore housing resources; CUA was to discuss signing consents with Mother; CUA was to file a Motion to Treat if necessary; CUA was to refer Mother for a Parenting Capacity Evaluation (PCE); out-of-county and virtual providers were to be explored; CUA was to obtain (RO[I])[] for Mother's treatment provider; Consortium was to provide treatment plan and progress notes; and the Family Finding report was to be PAC Filed within 24 hours.

*Id.* at 10 (footnote omitted).

At a permanency review hearing on June 1, 2023, the court again ordered that Children remain as committed and placed. The court ordered

that Mother was to have bi-weekly visits with 24-hour and day of confirmation. The [c]ourt further ordered that Mother[]and the IDS worker were to reconnect; Mother was to be referred to Lutheran Settlement House; a PCE referral was to be made forthwith for Mother; Consortium progress report was to be provided at the next court date; . . . and Mother's IDS worker was to provide Mother's progress report ten days prior to the next court date, if she did not appear.

*Id.*

The court found that Mother was "diagnosed as suffering from post-traumatic stress disorder (PTSD), major depressive disorder, and unspecified psychosis. She is prescribed medication to treat her symptoms of mental illness. Mother receives behavioral health services through The Consortium." *Id.* In addition, Mother suffers from diabetes, a seizure disorder, and scoliosis, for which she is prescribed medication.

On September 13, 2023, DHS filed a petition for the involuntary termination of Mother's parental rights with respect to Children. The trial court held termination hearings on March 7, 2024, and August 12, 2024. Mother

was represented by counsel, and Children were represented by Aaron Mixon, Esquire, as their counsel and guardian *ad litem*. **See** 23 Pa.C.S.A. § 2313(a) ("The court shall appoint counsel to represent the child in an involuntary termination proceeding when the proceeding is being contested by one or both of the parents.").

The court heard testimony from Ashley Jeffries,[6] N.R.H.'s foster mother, A.R.H.'s foster father, Mother, and Father. The court found that both children "suffer from significant medical issues that require frequent care from doctors and specialists in many disciplines." Trial Court Opinion, 10/31/24 at 15; N.T. Termination Hearing, 3/7/24, at 10. N.R.H., for instance, "require[s] occupational and physical therapy, was diagnosed with developmental delays, suffered from sleep apnea, and would require multiple surgeries." Trial Court Opinion, 10/31/24, at 15; N.T. Termination Hearing, 3/7/24, at 12-16. N.R.H.'s foster mother testified that Mother never attended any of N.R.H.'s medical appointments or inquired as to N.R.H.'s medical conditions. **See** N.T. Termination Hearing, 3/7/24, at 32. Moreover, she testified that she and N.R.H.'s foster father "completed extensive training to be certified as a medical foster home so that N.R.H. could be discharged to their care." Trial Court Opinion, 10/31/24, at 15-16; N.T. Termination Hearing, 3/7/24, at 12-16. Conversely, Mother did not participate in the training to receive the same certification. **See** N.T. Termination Hearing, 3/7/24, 32. The trial court found

_____

[6] Jeffris has been the case manager assigned to Children since November 2022.

that N.R.H.'s foster mother "credibly testified to loving N[.R.]H. like he was her son and noted that her children all love N[.R.]H. like a brother . . . [and] that she and her husband would love to adopt N[.R.]H." Trial Court Opinion, 10/31/24, at 16 (citing N.T. Termination Hearing, 3/7/24, at 22-31).

A.R.H. "was born with hypertonia[7] and diagnosed with global development delay . . . [and] sees many specialists, including a neurologist, occupational and physical therapists, an ear, nose, and throat specialist for issues related to ear infections, and ophthalmologist, and a speech therapist." *Id.* at 16; N.T. Termination Hearing, 3/7/24, at 37-39. A.R.H.'s foster father testified that A.R.H. came under his care only 15 days after A.R.H. was born and sees three specialists per week. *See* N.T. Termination Hearing, 3/7/24, at 35-36. He further testified that "A[.R.]H.'s [M]other [has] not attended any of A[.R.]H.'s medical appointments and have not inquired about his medical conditions." Trial Court Opinion, 10/31/24, at 16; N.T. Termination Hearing, 3/7/24, at 48-49. A.R.H.'s foster father testified that "[h]e and his family would very much like to adopt A[.R.]H." Trial Court Opinion, 10/31/24, at 17 (citing N.T. Termination Hearing, 3/7/24, at 42-44, 52).

The court also heard testimony from Jeffries, who has supervised this case since November 16, 2022. Jeffries testified that Mother has

---

[7] "Hypertonia is the abnormal increase in muscle tone as a result of upper motor neuron lesions. [] Without effective management, hypertonia can result in muscle imbalance, abnormal movement patterns, pain, joint contracture, joint deformity, and ultimately negatively impact a patient's function." https://pubmed.ncbi.nlm.nih.gov/28716516/ (last visited 4/16/25).

communicated "inconsistently." *Id.*; N.T. Termination Hearing, 8/12/24, at 7-12. Jeffries also stated that "Mother does not seem to understand the purpose of a CUA worker. . . . frequently calls [Jeffries] by the wrong name and sometimes does not recognize [Jeffries] when [Mother] sees her." *See* Trial Court Opinion, 10/31/24, at 17; N.T. Termination Hearing, 8/12/24, at 12-13. Jeffries testified that she has had difficulty talking with Mother about Children's respective needs and that Mother previously refused to sign a consent form to enter N.R.H. into an Applied Behavior Analysis program. Mother refused to sign the form because she believed CUA was tricking her to sign away her parental rights. Trial Court Opinion, 10/31/24, at 18; N.T. Termination Hearing, 8/12/24, at 13-15. Jeffries further testified that Mother has not had stable housing throughout the history of the case, despite efforts to secure housing through The Consortium. *See* N.T. Termination Hearing, 8/12/24, at 16-17. Mother has experienced periods of homelessness. *See id.* at 17. CUA worked with Mother to complete a domestic violence consultation, after which she was placed in a 90-day home with Women Against Abuse. *See id.* at 18. After completing that term, Jeffries testified Mother did not compete enough SCP objectives to find housing. *Id.* To Jeffries' knowledge, Mother could only find one-bedroom housing units through her work with The Consortium. *See id.* at 19. Jeffries also stated that Mother visited her children four times in 2024 and around nine times in 2023 and that Mother's excuses for missing visits include not having a working phone, oversleeping, and forgetting the appointment. *See id.* at 20.

- 10 -

Jeffries ultimately "rated Mother's overall compliance with her SCP objectives and her progress toward reunification as minimal." Trial Court Opinion, 10/31/24, at 18; N.T. Termination Hearing, 8/12/24, at 23-24. Additionally, Jeffries testified that "she does not believe [C]hildren can be safely reunified with Mother[,] as Mother has been unable to meet her own daily needs." Trial Court Opinion, 10/31/24, at 18; N.T. Termination Hearing, 8/12/24, at 24. Jeffries also testified that Children have never been in Mother's care. Jeffries stated that "it is difficult for her to assess whether [C]hildren have any bond with Mother, but that the bond they share with their foster parents is apparent[.]" Trial Court Opinion, 10/31/24, at 18; N.T. Termination Hearing, 8/12/24, at 24-28, 49. Jeffries later testified that Children have progressed well in their respective foster homes, where their medical and other needs are satisfied. *See* N.T. Termination Hearing, 8/12/24, at 24-25, 40. She testified that Children refer to their respective foster parents as "mom" and "dad," *see id.* at 27, 41; and Children would suffer irreparable harm if they were removed from their foster homes. *Id.* at 28, 42.

At the end of the hearings, the trial court granted the petition to involuntarily terminate Mother's parental rights, finding "clear and convincing evidence existed . . . pursuant to 23 Pa.C.S.A. §[§] 2511(a)(1)[,] (2)[,] (5)[,

and] (8)." Trial Court Opinion, 10/31/24, at 22.[8] The court also found that "pursuant to 23 Pa.C.S.A. § 2511(b), the termination of Mother's [] parental rights would not have a detrimental effect on []Children and that it was in []Children's best interests." *Id.*

On August 31, 2024, Mother filed separate notices of appeal and Pa.R.A.P. 1925 statements at each docket number. *See* Pa.R.A.P. 1925(a)(2)(i) (requiring concise statement of errors complained of on appeal to be filed and served concurrently with notice of appeal in children's fast track appeals). The trial court filed its Rule 1925(a) opinion on October 31, 2024.

On appeal, Mother raises the following issue for our review:

Whether the trial court committed reversible error when it terminated Mother's parental rights on less than clear and convincing evidence and where DHS and/or CUA failed to make reasonable accommodations for an intellectually challenged mother.

Appellant's Brief, at 4.

Our standard of review in cases involving termination of parental rights "is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child." *Matter of Adoption of M.A.B.*, 166 A.3d 434, 442 (Pa. Super. 2017). After considering all of the

_____

[8] The court also terminated Father's parental rights. Father's consolidated appeals have been addressed in a separatee memorandum decision. *See In the Interest of: N.R.H., a minor, Appeal of L.E.W., Father*, 2147 EDA 2024 and 2148 EDA 2024 (Pa. Super. filed May 6, 2025) (unpublished memorandum decision).

evidence, and the legal conclusions and findings of the trial court, "[w]e reverse only if we find an abuse of discretion, an error of law, or insufficient evidentiary support." *In re K.C.F.*, 928 A.2d 1046, 1049 (Pa. Super. 2007). An abuse of discretion is "the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will[,] or partiality, as shown by the evidence of record." *Commonwealth v. Nicoletti*, 328 A.3d 85, 90 (Pa. Super. 2024). The trial court "is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.M.*, 106 A.3d 114, 117 (Pa. Super. 2014). If the trial court's decision is supported by competent evidence, this Court will affirm even if the record could support the opposite conclusion. *Id.* at 117.

Here, the trial court terminated Mother's parental rights pursuant to sections 2511(a)(1), (2), (5), and (8). This Court need only agree with the trial court as to one subsection of section 2511(a), as well as section 2511(b), to affirm the termination of Mother's parental rights. *See In re M.E.*, 283 A.3d 820, 830 (Pa. Super. 2022) (citing *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (en banc)).

Mother argues the trial court erred or abused its discretion when it terminated her parental rights pursuant to section 2511(a)(1). Mother claims the "record does not support by clear and convincing evidence that Mother has evidenced a settled purpose of relinquishing her claim to her children or that she has refused or failed to perform her parental duties." Appellant's

Brief, at 21. She states that the "record demonstrates that she visited with her children when she did not have to attend her numerous [doctors] appointments" and "the record is clear and unequivocal that no reasonable accommodation was made to work with Mother's medical schedule so that she could have regular contact with her children." *Id.* at 21-22. She also claims that she "has substantially completed all of her [SCP] objectives except for her visitation objective," which she says is because "DHS and CUA would not reasonably accommodate her so that she could both avail herself of the necessary medical services to maintain her health and complete her visits." *Id.* at 22. Mother concludes by arguing that "[p]arental rights cannot be terminated solely on the basis that a parent cannot obtain housing." *Id.*

Section 2511(a)(1) reads as follows:

> **(a)** **General rule.**—The rights of parents in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

23 Pa.C.S.A. § 2511(a)(1).

Here, DHS filed the petition for the involuntary termination of parental rights on September 13, 2023, meaning the statutory six-month review period of Mother's conduct began on March 13, 2023. *See* 23 Pa.C.S.A. § 2511(a)(1). Although section 2511(a)(1) "focuses on the analysis of the six

- 14 -

months immediately preceding the filing of the petition, the court must consider the whole history of a given case and not mechanically apply the six-month statutory provision." **In re Q.R.D.**, 214 A.3d 233, 241 (Pa. Super. 2019) (internal quotation omitted). The performance of parental duties "requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances." **In re Adoption of L.A.K.**, 265 A.3d 580, 587-588 (Pa. 2021).

Moreover, "when a child is placed in foster care, a parent has an affirmative duty to work toward the return of the child." **In re Diaz**, 669 A.2d 372, 377 (Pa. Super. 1995). This duty, "at minimum, requires a showing by the parent of a willingness to cooperate with the agency to obtain the rehabilitative service necessary for the performance of parental duties and responsibilities." **Z.B. ex rel. A.B.**, 315 A.3d 153, 161 (Pa. Super. 2024) (quoting **In re Adoption of J.J.**, 515 A.2d 883, 890 (Pa. 1986)). The agency must "put forth a good faith effort *in making services available to the parent*, and once it has done so on a continuing basis, it has discharged this obligation." **In re Adoption of J.J.**, 515 A.2d at 890 (emphasis in original).

Before we begin our analysis, we note that Mother's brief is substantially non-compliant with our rules of appellate procedure. Regarding appellate briefs, "[i]f reference is made to the pleadings, evidence, charge, opinion or order, or any other matter appearing in the record, the argument must set forth, in immediate connection therewith, or in a footnote thereto, a reference

- 15 -

to the place in the record where the matter referred to appears." Pa.R.A.P. 2119(c). Appellate briefs that fail to adhere to the Pennsylvania Rules of Appellate Procedure may be waived, and arguments that are not appropriately developed are waived. **See Karn v. Quick & Reilly**, 912 A.2d 329, 336 (Pa. Super. 2006). "Arguments not appropriately developed include those where the party has failed to cite any authority in support of a contention." **Lackner v. Glosser**, 892 A.2d 21, 29-30 (Pa. Super. 2006).

In the argument section of Mother's brief, she cites no case law, nor does she cite to the record to support her contentions. **Lackner**, **supra**. While we could find Mother's arguments waived for her noncompliance, we nonetheless will address them in the interest of justice.

Mother claims that "she visited with her children when she did not have to attend her numerous [doctors'] appointments." Appellant's Brief, at 21. However, Mother does not cite to anywhere in the record to support this claim. She cites no evidence that her visitations with Children, in fact, conflicted with various medical appointments. Conversely, the record does show, through Jeffries' testimony, that Mother gave numerous other explanations for missing visits, including not having a phone, oversleeping, not confirming visitations in time, forgetting that her doctors' appointments conflict with the visitations, and going out with friends. **See** N.T. Termination Hearing, 8/12/24, at 20, 62.

Additionally, Mother claims she has "substantially completed all her objectives except for her visitation objective." Appellant's Brief, at 22. This

- 16 -

claim is similarly belied by the record. Mother's SCP objectives were "[t]o engage in ID[S] services; to engage with the behavioral health program and follow any and all recommendations; to sign any and all needed releases, as well as consents; to maintain the [parent-child] bond through visitation per the court order, as well as to find and maintain stable housing." N.T. Termination Hearing, 8/12/24, at 8-9. These objectives remained the same throughout the history of the case. *Id.* at 9. While Jeffries testified that Mother had completed all of her ARC services, Jeffries also testified that Mother had repeatedly refused to sign necessary consents for N.R.H. to attend an applied behavior analysis program. *Id.* at 14-16, 55-57. Additionally, the record reveals Mother lacked stable housing throughout the history of the case. *Id.* at 16-19. Mother also visited Children infrequently in 2023 and 2024, *see id.* at 20, 62; Jeffries characterized the 2024 visits as a "struggle," testifying that "there was a lot of crying" from Children during the first 2024 visit. *Id.* at 20-21. Ultimately, Jeffries rated Mother's compliance with her SCP objectives as minimal, and her progress toward reunification with Children as minimal. *Id.* at 23-24.

Based on the record, we discern no abuse of discretion or error of law by the trial court in terminating Mother's parental rights pursuant to section 2511(a)(1). *See In re K.C.F.*, *supra*. The record shows Mother failed to consistently visit Children and repeatedly refused to sign consent forms necessary for N.R.H.'s medical treatment. Additionally, the trial court was free to accept and find Jeffries' testimony as credible. *See In re M.M.*, *supra*.

Even though there was evidence that Mother complied with some of her SCP objectives, the record supports the trial court's determination. **In re M.M.**, **supra** (this Court will affirm trial court's decision if supported by competent evidence, even if record could support opposite conclusion).

Having concluded that the record supports the trial court's section 2511(a)(1) determination, we will proceed to analyze Mother's section 2511(b) claim. **See B.L.W., supra**. Mother argues the trial court erred or abused its discretion when it terminated her parental claims pursuant to section 2511(b), which reads:

> **(b) Other considerations.--** The court in terminating the rights of a parent shall give primary consideration to the developmental, physical[,] and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing[,] and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b).

Mother argues the trial court's judgment was manifestly unreasonable and, therefore, an abuse of discretion. **See Nicoletti**, **supra**. Mother claims "[b]oth of the children looked upon [] Mother as their [m]other" as "[t]hey called her Mom" and she "engage[d] her children during her visits as best as her intellectual limitations allowed." Appellant's Brief, at 24. Mother argues her "bond with her children could have been strengthened during her visits[,

but the bond] was necessarily interfered with because DHS or CUA would not reasonably accommodate [] Mother's medical appointments." *Id.* Again, Mother does not cite any case law or to any evidence of record to support her claims under section 2511(b). *Lackner*, *supra*.

This Court has held:

While a parent's emotional bond with his or her child is a major aspect of the [section] 2511(b) analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child. **In addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent**. In determining needs and welfare, the court may properly consider the effect of the parent's conduct upon the child and **consider whether a parent is capable of providing for a child's safety and security** or whether such needs can be better met by terminating a parent's parental rights.

Furthermore, our Supreme Court has stated, common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents. The Court directed that, in weighing the bond considerations pursuant to [section] 2511(b), courts must keep the ticking clock of childhood ever in mind. The [] Court observed, children are young for a scant number of years, and we have an obligation to see [to] their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children.

*In re M.E.*, *supra* at 837 (emphasis added) (internal citations and quotations omitted).

In determining whether a parent-child bond exists, this Court has said the bond "must exhibit a bilateral relationship [that] emanates from the parents' willingness to learn appropriate parenting, anger management, drug

- 19 -

rehabilitation[,] and marital stability." ***In re K.K.R.-S.***, 958 A.2d 529, 534 (Pa. Super. 2008) (quoting ***In re Involuntary Termination of C.W.S.M.***, 839 A.2d 410, 418-19 (Pa. Super. 2003) (Tamilia, J., dissenting)). In cases where there is no evidence of a bond between a parent and child, "it is reasonable to infer that no bond exists." ***In re B.C.***, 36 A.3d 601, 611 (Pa. Super. 2012) (citation omitted).

Here, the record reveals that Mother and Children share a weak bond, and Mother is not presently capable of providing for their safety and security. ***See In re M.E.***, ***supra***. Children have never been in Mother's care. ***See*** N.T. Termination Hearing, 8/12/24, at 24, 39. Mother has not attended any of Children's various medical appointments. ***See*** N.T. Termination Hearing, 3/7/24, at 32, 48-49. Mother lacks stable housing, ***see*** N.T. Termination Hearing, 8/12/24, at 16-18, and often forgets visitation appointments. ***See id.*** at 20. Jeffries testified that she "constant[ly]" reminds Mother of the process to confirm visits and worries that she could forget the numerous appointments Children each have. ***Id.*** at 46. Ultimately, Jeffries testified that Children could not safely reunite with Mother and believes Mother does not have the present capacity to meet even her own needs. ***Id.*** at 24.

Additionally, Jeffries testified that N.R.H. calls Mother "mom" during visits, but stated that he says it "haphazardly," adding that "[i]t's not like he's genuine in it." N.T. Termination Hearing, 8/12/24, at 28. Jeffries reported that N.R.H. does not ask about Mother outside of visits. ***Id.*** at 28. Additionally, A.R.H.'s foster father testified that A.R.H. is "not himself" after

visits with Mother, saying that A.R.H. is "shut off. Usually crying or asleep at the end. And [has a] stone affect." N.T. Termination Hearing, 3/7/24, at 50-51. Jeffries added that, conversely, Children each have strong bonds with their foster parents, *see* N.T. Termination Hearing, 8/12/24, at 27, 49, and each would suffer irreparable harm if removed from their foster homes. *See id.* at 47.

The record supports the trial court's finding that Children and their respective foster families share a strong bond. *See In re M.E.*, *supra*. The trial court found "[i]t [] clear . . . from the testimony that a parent/child bond existed between [] Children and their current foster parents," adding that "[t]he testimony of [] Jeffries and the foster parents [was] deemed to be credible and accorded great weight." Trial Court Opinion, 10/31/24, at 21. *See also In re M.M.*, *supra* (trial court free to make credibility determinations). At the time of the termination hearing, N.R.H. had been with his foster family for almost three years. *See* N.T. Termination Hearing, 3/7/24, at 10. N.R.H. suffers from developmental delays, autism, and feeding issues related to laryngomalacia and dysphagia, and requires various occupational and physical therapies. *Id.* at 10-14. He also has sleep apnea, has had surgeries on his penis, tongue, ears, and eye, and takes toddler formula to ensure he consumes enough calories. *Id.* at 12-16. His foster mother and foster father completed extensive training to become a certified medical foster home before N.R.H. could be released into their care. *See id.* at 14. N.R.H. sees eleven specialists throughout the year, and multiple

therapists every week. *See id.* at 16-17. N.R.H.'s foster mother testified that N.R.H. has made strong progress since N.R.H. has been in her care. *See id.* at 28. Additionally, N.R.H.'s foster mother testified that she "love[s [N.R.H.] as her own son," that her other children "love" N.R.H., and that she and her husband would "love to adopt" N.R.H. *Id.* at 22, 30-31. Jeffries corroborated the testimony of N.R.H.'s foster mother, stating that N.R.H.'s foster siblings "see him as a little brother" and that N.R.H. "looks to [his foster parents] for all his care and his needs [and c]alls them mom and dad." N.T. Termination Hearing, 8/12/24, at 26-27. Jeffries further testified that N.R.H.'s foster family is meeting his daily needs and that removing N.R.H. from their care would cause "extreme[]" irreparable harm to N.R.H. *Id.* at 27-28.

Moreover, A.R.H.'s foster father testified that A.R.H. had been in his care since A.R.H. was two weeks old. *See* N.T. Hearing Volume 1, 3/7/24, at 35-36. At that point, A.R.H. was taking special medications, received a diagnosis for hypertonia, and was later diagnosed with global developmental delay. *See id.* at 37. A.R.H. receives neurological care, physical and occupational therapies, and sees an ear, nose, and throat specialist, an ophthalmologist, and a speech therapist. *See id.* at 38-39. Typically, A.R.H. sees three specialists every week. *See id.* at 40. A.R.H.'s foster father testified that A.R.H.'s "progress is good," and outside of his developmental delays, A.R.H. is "a happy and healthy little boy." *Id.* at 40-41. He further testified that A.R.H. is "a smiling, talkative, fun" boy who is "[a]bsolutely affectionate" and refers to his foster parents as "Mama [and] Dada." *Id.* at 42-43. A.R.H.'s

foster father also testified that his three other children "are absolutely in love with" A.R.H. and view him as "their little brother." *Id.* at 44. He testified that he and his wife are interested in adopting A.R.H. *Id.* at 52. Jeffries corroborated this testimony, testifying that, in his foster home, A.R.H. is "progressing[,] getting his needs met[, and] asking for when he wants his needs met." N.T. Hearing Volume 1, 8/12/24, at 40. Jeffries described A.R.H.'s interactions with his foster family as "[f]un[ and] loving[,]" adding "[t]hat's who he goes to and gets his needs met on a daily basis." *Id.* at 41.

The record supports the trial court's finding that a parent-child relationship exists between Children and their respective foster families, who are both adoptive resources. Additionally, it is clear from the record that Children's various needs are satisfied by their foster families, who provide Children with love, comfort, security, and stability. *In re M.E.*, *supra*. Accordingly, we find no abuse of discretion or error of law in the trial court's decision to terminate Mother's parental rights to Children under subsection 2511(b). *See In re K.C.F.*, *supra*. We, therefore, affirm.

Decrees affirmed.

Judge Dubow did not participate in the consideration or decision of this case.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: <u>5/7/2025</u>